Joseph J. O'BRIEN, Plaintiff–Appellee,

v.

CITY OF GRAND RAPIDS; William Hegarty; Daniel Ostapowicz, Defendants–Appellants.

No. 92–1549.

United States Court of Appeals, Sixth Circuit.

Argued June 8, 1993.

Decided May 3, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied July 18, 1994.*

---

\* Keith, J., would grant rehearing for the reasons stated in his dissent.

See Also: 783 F.Supp. 1034.

Nancy L. Dilley, Fred Dilley (argued and briefed), Dilley & Dilley, Grand Rapids, MI, for plaintiff-appellee.

G. Douglas Walton, Dep. City Atty. (briefed), Margaret P. Bloemers (briefed), City Attorney's Office for the City of Grand Rapids, Grand Rapids, MI, Grant J. Gruel (argued and briefed), Thomas Richard Behm (briefed), Gruel, Mills, Nims & Plyman, Grand Rapids, MI, for defendants-appellants.

Before: KEITH and RYAN, Circuit Judges; and JOINER, Senior District Judge.[**]

RYAN, Circuit Judge, delivered the opinion of the court. JOINER, Senior District Judge (pp. 23–30), delivered a separate concurring opinion as to Part II B and delivered the opinion of the court with respect to the issues discussed in Part II C to which Judge Ryan dissents. KEITH, Circuit Judge (p. 31), delivered a separate opinion concurring in part and dissenting in part.

RYAN, Circuit Judge.

Plaintiff Joseph O'Brien brought this 42 U.S.C. § 1983 action against the City of Grand Rapids, Police Chief William Hegarty, and Officer Daniel Ostapowicz, alleging that the defendants violated his Fourth Amendment rights when they searched his house and used excessive force to effect his arrest. The district court entered judgment as a matter of law against all three defendants on the basis of the court's conclusion that they violated O'Brien's Fourth Amendment rights by authorizing a warrantless search of his house. The defendants appeal and raise the following issues:

1) Whether the district court erred in ruling that O'Brien's Fourth Amendment rights were violated when the police conducted three physical "probes" of O'Brien's house without a warrant;

2) Whether the district court erred in ruling that Hegarty and Ostapowicz were not entitled to qualified immunity; and

3) Whether the district court erred in ruling that the search was the result of official city policy, custom, or practice,

[**] The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

making the city liable for the constitutional violation.

We conclude that the district court correctly ruled that O'Brien's Fourth Amendment rights were violated when his house was searched without a warrant. However, we conclude that the district court erred when it determined that Hegarty and Ostapowicz were not entitled to qualified immunity and when it concluded as a matter of law that the search was a result of official policy, custom, or practice. We shall therefore reverse the district court's order granting judgment for O'Brien and remand with instructions to enter judgment in favor of the defendants.

## I.

On October 6, 1987, court officer Bart Baker of the 61st District Court in Grand Rapids, Michigan, attempted to seize, pursuant to a writ of seizure, plaintiff O'Brien's pick-up truck to satisfy a $34,000 civil judgment that had been entered against O'Brien. The truck was parked in the street in front of O'Brien's house. Officer Baker requested police assistance because he was aware that a default judgment had been entered against O'Brien as a result of a lawsuit in which the plaintiff in that case claimed that O'Brien intentionally shot him in O'Brien's yard.

Officer Dennis Johnson of the Grand Rapids Police Department arrived in uniform to assist Officer Baker. Officer Johnson knocked on the front and back doors of O'Brien's house in an attempt to let O'Brien know that Baker was about to seize his truck, but O'Brien did not respond. Neighbors informed Johnson that O'Brien was home but probably would not answer the door, and that he was reclusive and often acted strange. At approximately 11:50 a.m., when O'Brien had not responded, Johnson instructed Officer Baker to seize the truck. Johnson stood guard on O'Brien's front lawn while a tow truck was hooked up to O'Brien's truck. Johnson suddenly noticed O'Brien standing in his doorway behind the closed storm door, carrying a rifle in the port arms position. The tow truck driver and a neighbor ran for cover while Officers Baker and Johnson drew

their weapons. Johnson ordered O'Brien to drop his weapon. O'Brien yelled, "Leave my truck alone! Get out of here!" He then retreated into his house and shut the door. O'Brien did not point the rifle at anyone, and he did not verbally threaten to use it.

After the officers took cover, Johnson called for backup, and within a few seconds other officers responded to the scene, including the Neighborhood Patrol Unit (NPU). The NPU officers are specially trained to manage "critical incidents" involving "barricaded gunmen." At Johnson's request, Lieutenant Ostapowicz,[1] the shift commander, and the Chief of Police, William Hegarty, had authorized the NPU to respond to the scene. As shift commander, Ostapowicz became the scene commander of the situation involving O'Brien. Although the NPU was responsible for managing the situation, any action had to be authorized by the scene commander.

The police evacuated the neighborhood and secured the perimeter around O'Brien's house. Trained negotiators arrived at the scene at 12:30 p.m. They repeatedly tried to reach O'Brien via telephone, but O'Brien would not answer their calls. Negotiators also attempted to communicate through a bullhorn; however, O'Brien did not respond. Chief Hegarty arrived at the scene at 2:20 p.m., left shortly thereafter, and returned at 5:00 p.m. At 4:05 p.m., O'Brien's father attempted to talk with his son through the bullhorn. Still there was no response from O'Brien. Officials tried for nearly six hours to communicate with O'Brien; however, they never informed O'Brien that he was under arrest. At trial, Hegarty testified that he was not sure that O'Brien had violated any laws during those six hours for which he could be arrested. During the first six hours of the stand-off, police gathered information on O'Brien and learned that he had a history of physical and mental problems and that he had been arrested in the past for violent behavior but was subsequently cleared of any charges. From the information gathered by the police, Ostapowicz concluded that O'Brien was mentally unstable, unpredictable, and very dangerous.

---

1. Ostapowicz was a captain by the time of trial.

By late afternoon, Ostapowicz and Chief Hegarty developed and authorized a response plan that included the use of three "probes" that would allow an officer to see inside the house. According to the defendants, the purpose of the probes was to ascertain where O'Brien was in the house in order to better communicate with him. Chief Hegarty later testified that they did not believe a search warrant was required for the probes because it was not the department's policy to seek warrants while a critical incident involving a barricaded gunman was in progress. Hegarty also testified that there was no need for a search warrant because the officers did not need, nor did they intend, to search the house.

At approximately 4:25 p.m., Chief Hegarty and Ostapowicz authorized the first probe of O'Brien's house. At 4:29 p.m., Officer Gary Ingalls pulled back the chicken wire and screen that covered a living room window. He applied mirrors to the window frame in an attempt to determine O'Brien's location in the house, but Ingalls could not see inside the house because the window was dirty. At 5:25 p.m., Officer Ingalls used a sledge hammer to break part of the window so that he could see into the living room with the mirror probe and so that O'Brien could hear the bullhorn. Ingalls could view the interior of the living room through the probe, but he could not see O'Brien.

A negotiator continued to use the bullhorn to communicate with O'Brien. Finally, according to police testimony, at 5:51 p.m. O'Brien responded, yelling, " 'I don't want to go to jail.' " At 5:55 p.m., Ingalls broke the glass from the upper half of the living room window. In response, O'Brien fired approximately ten shots at the police. Later, Hegarty agreed that O'Brien presented "no overt physical, hostile threat at any time from 11:50, when he closed his door, until 5:56 when the shot was fired."

At 6:27 p.m., Chief Hegarty issued a shoot-to-kill order. During the next two hours, the police continued trying to communicate with O'Brien. They eventually used tear gas and stun grenades in an attempt to force him out of the house, or at least to talk. These efforts were unsuccessful. At 8:43 p.m., approximately nine hours after the incident began, acting on Hegarty's orders to shoot to kill, Officer Stan Lis shot O'Brien in the neck after he spotted his silhouette in the kitchen window. The police entered the house, arrested plaintiff, and placed him in an ambulance. The bullet severed O'Brien's spinal cord and rendered him a quadriplegic. O'Brien was not charged with any crime as a result of his initial confrontation with Officer Johnson, but he was charged with attempted murder and convicted of assault because of the shots he fired at the police officers after the 5:55 p.m. probe.

O'Brien filed a complaint against the City of Grand Rapids and several officers at the scene, alleging claims pursuant to 42 U.S.C. § 1983 for deprivation of his rights under the Fourth Amendment, as well as state assault and battery claims. O'Brien alleged that his Fourth Amendment rights were violated when the police searched his house and when they used excessive force to effect his arrest. O'Brien subsequently amended his complaint to include Police Chief Hegarty and Captain Ostapowicz. Jury trial commenced on January 21, 1992. During O'Brien's case in chief, the trial court entered judgment as a matter of law against Hegarty and Ostapowicz on O'Brien's unreasonable search claim. The court ruled that the defendants violated O'Brien's Fourth Amendment rights when they authorized three physical probes of his house without obtaining a warrant.[2] The court also concluded that Hegarty and Ostapowicz were not entitled to qualified immunity for their actions. At the close of the defendants' case, the trial court entered judgment as a matter of law against the City of Grand Rapids after finding that the municipality's policies caused the Fourth Amendment violation.

2. The district court determined that the three probes of O'Brien's house constituted a search and seizure within the meaning of the Fourth Amendment; that O'Brien's window and house were protected areas under the Fourth Amendment; that the use of mirrors to see into O'Brien's home, as well as breaking his windows, constituted a search and seizure of his home; and that the search and seizure was unreasonable because no exigent circumstances existed to justify the warrantless search.

The district court instructed the jury on the remaining state and constitutional issues,[3] and the parties made closing arguments. The jury deliberated almost three days but did not reach a verdict, so the court declared a mistrial. That same day, the district court ordered the parties to participate in a settlement conference and scheduled a new trial date.

A magistrate judge presided over the settlement conference. The parties agreed to settle all claims still pending, except the Fourth Amendment search claim that was the subject of the three orders granting O'Brien's motions for judgment as a matter of law against the city and defendants Hegarty and Ostapowicz. The parties agreed that the defendants would appeal those orders. Settled claims were dismissed, and final judgment on the Fourth Amendment search claim was entered on April 9, 1992. The defendants subsequently filed their notice of appeal.

## II.

To succeed on a cause of action under 42 U.S.C. § 1983, a plaintiff must establish that: 1) he was deprived of a right secured by the federal Constitution or laws of the United States; 2) the deprivation was caused by a person acting under color of state law; and 3) the deprivation occurred without due process of the law. *Rhodes v. McDannel,* 945 F.2d 117, 119 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 872, 116 L.Ed.2d 777 (1992). Defendants dispute the district court's conclusion that O'Brien's rights under the Fourth Amendment were violated when officers of the Grand Rapids Police Department conducted three physical probes of his house without first obtaining a search warrant.[4] Hegarty and Ostapowicz also argue that they are not subject to suit under section 1983 because they enjoy qualified immunity, while the city argues that it cannot be held liable under section 1983 because O'Brien failed to establish that the constitutional violation was a result of an official city practice or policy.

The federal rule governing judgment as a matter of law provides, in relevant part, as follows:

If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim ... that cannot under the controlling law be maintained without a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1). "Motions for judgment as a matter of law may be made at any time before submission of the case to the jury." Fed.R.Civ.P. 50(a)(2).

■ This court's standard of review of a motion for judgment as a matter of law is identical to the standard used by the district court. *Marsh v. Arn,* 937 F.2d 1056, 1060 (6th Cir.1991); *King v. Love,* 766 F.2d 962, 969 (6th Cir.), *cert. denied,* 474 U.S. 971, 106 S.Ct. 351, 88 L.Ed.2d 320 (1985). Thus, when reviewing a motion for judgment as a matter of law, this court should not weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury; rather, this court must view the evidence in the light most favorable to the party against whom the motion is made and give that party the benefit of all reasonable inferences. *Lewis v. City of Irvine, Ky.,* 899 F.2d 451, 454–55 (6th Cir.1990). This court should affirm the granting of the motion " 'if there is a complete absence of pleading or proof on an issue or issues material to the cause of action or where there are no controverted issues of fact upon which reasonable men could differ.' " *Kitchen v. Chippewa Valley Sch.,* 825 F.2d 1004, 1015 (6th Cir.1987) (quoting *Rockwell Int'l Corp. v. Regional Emergency Med. Serv. of N.W. OH, Inc.,* 688 F.2d 29, 31 (6th Cir.1982)).

### A.

#### Fourth Amendment Violation

At trial, Hegarty, Ostapowicz, and other officers involved with the incident testified

---

3. Namely, whether excessive force was used to effect O'Brien's arrest.

4. O'Brien's claim that the police used excessive force to effect his arrest was settled and is not before us.

that O'Brien's house was surrounded within minutes of O'Brien's initial confrontation with Johnson and that there was no risk of his escaping unnoticed once the house was surrounded. Furthermore, according to the officers' testimony, they were not concerned with the destruction of any contraband. Their goal was to disarm and, perhaps, to arrest O'Brien, without harm to officers, O'Brien, or innocent bystanders. The district court found that the defendants failed to demonstrate sufficient facts upon which a reasonable jury could find that exigent circumstances or any other reason existed to justify the warrantless search.

The defendants argue that the district court erred in ruling as a matter of law that the three probes of O'Brien's house violated the Fourth Amendment. According to the defendants, they thought they had probable cause to arrest O'Brien after he confronted Officer Johnson with the rifle, and the three warrantless probes were reasonable because the police were in "hot pursuit" of O'Brien, and because O'Brien had created exigent circumstances by barricading himself in the house. O'Brien argues that even if the police had probable cause to arrest him, the Fourth Amendment did not permit a warrantless search of his house absent exigent circumstances, and no exigent circumstances existed to justify the intrusion.

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourteenth Amendment incorporates the Fourth Amendment, prohibiting unreasonable searches and seizures by the states. *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). According to the Supreme Court,

[t]he Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... houses ... shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton v. New York,* 445 U.S. 573, 589–90, 100 S.Ct. 1371, 1381–82, 63 L.Ed.2d 639 (1980) (citation omitted). Thus, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586, 100 S.Ct. at 1380; *see Michigan v. Tyler,* 436 U.S. 499, 506, 98 S.Ct. 1942, 1948, 56 L.Ed.2d 486 (1978); *see generally Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Even if police have probable cause to arrest a suspect, a warrant is required for police entry into the suspect's house unless there are exigent circumstances that excuse the warrant requirement.[5] *Coolidge v. New Hampshire,* 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042–43, 29 L.Ed.2d 564 (1971).

---

5. This court has found exigent circumstances to justify a warrantless arrest in a suspect's home in the following three instances:

1) when the officers were in hot pursuit of a fleeing suspect;
2) when the suspect represented an immediate threat to the arresting officers or the public; and
3) when immediate police action was necessary to prevent the destruction of vital evidence or thwart the escape of known criminals.

*Jones v. Lewis,* 874 F.2d 1125, 1130 (6th Cir. 1989).

The defendants do not dispute that the three probes constituted a warrantless search of O'Brien's house. They argue that they have overcome the presumption that their warrantless search was unreasonable because 1) they were in hot pursuit of O'Brien, and 2) other exigent circumstances existed.

"Exigent circumstances," something of a term of art, denotes the existence of "'real immediate and serious consequences'" that would certainly occur were a police officer to "'postpone[] action to get a warrant.'" *Welsh v. Wisconsin,* 466 U.S. 740, 751, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732 (1984) (quoting *McDonald v. United States,* 335 U.S. 451, 459–60, 69 S.Ct. 191, 195, 93 L.Ed. 153 (1948) (Jackson, J., concurring)). The phrase has been understood by the Supreme Court to comprise, generally, two separate sets of circumstances: 1) "the imminent destruction of vital evidence," *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963), and 2) the "'need to protect or preserve life or avoid serious injury,'" *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (citation omitted), either of police officers themselves or of others, *Hayden,* 387 U.S. at 299, 87 S.Ct. at 1646.

Examples of "exigent circumstances" exceptions to the warrant requirement abound in Supreme Court case law: 1) the "automobile exception," *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); 2) search incident to arrest, *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); 3) "inventory" searches, *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983); 4) "hot pursuit," *Hayden,* 387 U.S. 294, 87 S.Ct. 1642; 5) "stop and frisk," *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); 6) "border searches," *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); 7) "plain view," *Coolidge,* 403 U.S. 443, 91 S.Ct. 2022; 8) "school searches," *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); 9) "consent searches," *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); and 10) "administrative searches," *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981).

According to the defendants, the police had probable cause to believe O'Brien committed an assault when he confronted Johnson with the rifle and that it was thus reasonable to conduct the probes because the police were in hot pursuit of O'Brien. We conclude, however, that the "hot pursuit" exception does not apply to the undisputed facts in this case. Officer Johnson chose not to pursue O'Brien at the initial confrontation and instead called for backup to surround the house and secure the area, thereby slowing down and controlling the action. According to the officers' testimony, the house was surrounded, O'Brien could not flee the scene unnoticed, and the officers did not fear the destruction of evidence. Furthermore, O'Brien was not holding anyone hostage and had taken no action against the officers during the nearly six hours between the time of the confrontation and the probe. Even if reasonable fact finders might agree that the officers were in pursuit of O'Brien during the six hours as they took control of the area, gathered information, and developed a response plan, under the facts of this case, no reasonable fact finder would find that they were in hot pursuit.

The defendants also argue that other "exigent circumstances" existed that excused the warrant requirement. The defendants do not claim that immediate police action was necessary to prevent the destruction of evidence or to prevent O'Brien's escape. Rather, they claim that exigent circumstances arose from the threat to the safety of the police officers and innocent bystanders in the area. However, to justify the officers' failure to obtain a warrant, the facts must show that the threat to the officers or the public was "immediate." *See United States v. Morgan,* 743 F.2d 1158, 1162–63 (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985). The undisputed facts show that from the time O'Brien retreated into the house until just before the third probe, O'Brien had taken no action against the officers. Even when he initially confronted Johnson, he did not point the gun at anyone or verbally threaten to use it. While

a reasonable fact finder might infer that the officers felt threatened, there is no evidence establishing that the threat of danger was "immediate." Thus, the trial court correctly concluded that no exigent circumstances existed to excuse the officers' failure to obtain a warrant during the four-and-a-half hour delay before executing the first probe of O'Brien's house.

■ The police categorize their engagement with O'Brien as a "critical incident," and argue that a critical incident involving a barricaded gunman is an exigent circumstance. They ask this court to adopt critical incidents as a new category of *per se* exigent circumstances. But such a *per se* rule would leave the decision to obtain a warrant dependent on the discretion of police officers and on whether the officers determine that a situation is a critical incident. The Supreme Court has held that, as a general rule, the decision whether to obtain a warrant should not be left with police officers:

> Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.... [A] grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance.

*Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) (footnote omitted). Hegarty and Ostapowicz acknowledged that whether a critical incident involves exigent circumstances depends on the facts surrounding that incident. Although police may treat certain situations as critical incidents, this does not mean that those situations will always involve exigent circumstances justifying a warrantless search or seizure. We see no valid reason to create a new *per se* exception to the warrant requirement for critical incidents.

In this case, however, the facts indicate that from the time of O'Brien's initial confrontation with Johnson at about 11:50 a.m. until O'Brien fired shots at 5:55 p.m., the police were not trying to arrest O'Brien, and

O'Brien had retreated from the confrontation. Furthermore, the fact that the officers waited four-and-a-half hours before deciding to use the first probe belies defendants' claim that exigent circumstances existed that prevented them from seeking a warrant.

■ Finally, defendants argue that reasonable minds could have concluded that the situation involving O'Brien was an exigent circumstance and that the district court should not have decided this issue as a matter of law. In a civil damage suit, whether exigent circumstances existed to excuse a warrantless arrest is a question for the jury provided that, given the evidence on the matter, there is room for a difference of opinion. *Jones v. Lewis,* 874 F.2d 1125, 1130 (6th Cir.1989). In this case, the facts are undisputed, and a rational jury would draw only one inference from these undisputed facts. Consequently, the district court appropriately determined the issue as a matter of law.

## B.

### Qualified Immunity

According to Hegarty and Ostapowicz, they are entitled to qualified immunity because O'Brien failed to show that no reasonable officer would have concluded that the situation involving O'Brien constituted exigent circumstances. Plaintiff O'Brien responds that his right to be free from an unreasonable search is clearly established and that defendants were not entitled to qualified immunity because no rational officer would have concluded that exigent circumstances existed justifying the warrantless search.

■ Resolution of qualified immunity is a question of law for the district court. *Poe v. Haydon,* 853 F.2d 418, 424 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989). Because the issue of qualified immunity is a legal question, no deference is due the district court's conclusion. *Ramirez v. Webb,* 835 F.2d 1153, 1156 (6th Cir.1987).

■ Generally, qualified immunity protects a police officer from being sued for his discretionary actions as long as the officer

neither " 'knew [n]or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights ... affected, or ... took action with the malicious intention to cause a deprivation of a constitutional right....' " *Robinson v. Bibb,* 840 F.2d 349, 350 (6th Cir.1988) (quoting *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975)). The question whether an official is protected by qualified immunity does not turn on the subjective good faith of the official; rather, it turns on the "objective legal reasonableness" of his actions, assessed in light of the legal rules that were "clearly established" at the time the actions were taken. *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). To determine whether qualified immunity protects Hegarty and Ostapowicz, we must inquire: 1) whether O'Brien identified a clearly established right alleged to have been violated; and 2) whether a reasonable police officer in the defendants' position should have known that his conduct was undertaken in violation of these rights. *See Johnson v. Estate of Laccheo,* 935 F.2d 109, 111 (6th Cir.1991).

The right O'Brien alleges to have been violated was clearly established: the right of persons to be protected from a warrantless search of their house unless exigent circumstances require immediate police action. Thus, the relevant question before us is whether an objectively reasonable officer would have believed that exigent circumstances existed to justify the warrantless search in light of clearly established law and in light of the information possessed by the defendants. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987).

■ When determining the objective legal reasonableness portion of the qualified immunity standard, individual claims of immunity must be analyzed on a fact-specific, case-by-case basis to determine whether the plaintiff's constitutional rights were so clearly established when the alleged misconduct was committed that any official in the defendants' position would understand that what he did violated those rights. *See id.* at 640–

41, 107 S.Ct. at 3039–40. The official will be immune " 'if officers of reasonable competence could disagree' on whether the conduct violated the plaintiff's rights." *Gossman v. Allen,* 950 F.2d 338, 341 (6th Cir.1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). The fact that Hegarty and Ostapowicz may have subjectively believed that exigent circumstances existed to warrant the search is irrelevant; the standard is one of objective reasonableness.

Qualified immunity would protect Hegarty and Ostapowicz from suit if it were objectively reasonable for the officers to conclude, given the information they had, that immediate action to conduct the probes without first obtaining a warrant was necessary—that is, that exigent circumstances existed to excuse their failure to obtain a warrant before entering O'Brien's residence.

■ We reject out of hand the argument that the officers reasonably believed that they were in hot pursuit of O'Brien. If they believed that, they would not have waited four-and-a-half hours to act. Not only was there no hot pursuit, there was, for most of the afternoon, no pursuit at all. We are satisfied that no reasonable officer in the circumstances of Hegarty and Ostapowicz would conclude that he was in hot pursuit of O'Brien and, for that reason, excused from obtaining a search or arrest warrant.

But Hegarty and Ostapowicz also argue that reasonable officers in their circumstances, objectively assessing the circumstances as they existed that day, could conclude that the "critical incident," in its totality, was an exigent circumstance excusing a warrant. We agree.

■ With the infallible perception of 20/20 hindsight, we can now see that there was a probability that O'Brien might have remained inactive and hidden indefinitely. But this was not the perception from which we must assess the objective reasonableness of Hegarty's and Ostapowicz's action.

They had on their hands a barricaded gunman, who had previously shot and wounded a citizen in the front yard of the same premises. They had been told that O'Brien had

assaulted Officer Johnson with a rifle. They knew he was armed, dangerous, and unpredictable. He had a history of violence and mental problems. The immediate neighborhood had been evacuated, the house was surrounded, darkness was approaching, and there was the concern about whether the neighbors should be permitted to return to their homes. The situation was tense and dramatic, and it was not unreasonable to conclude that there was a possibility of sudden and violent action at the scene at any moment.

We think it is clear that the officers were not, in law, excused on exigent circumstance grounds from obtaining a warrant before invading O'Brien's house. But we cannot say that no reasonable officer, objectively assessing the situation, could conclude that there were exigent circumstances excusing the requirement that a warrant be obtained. Hegarty and Ostapowicz are not held to the standards of a constitutional law scholar concerning the vagaries of the exigent circumstances exception to the warrant requirement of Fourth Amendment law. They were policemen, command officers to be sure, dealing with a potentially dangerous incident in the middle of a residential neighborhood, that might have exploded at any moment. The fact that, in law, exigent circumstances did not exist is not dispositive. The officers' conduct in devising a strategy to deal with the dangerous incident before them, and the conclusion that they faced an exigent circumstance that excused a warrant before ordering the probe of O'Brien's residence, was not so objectively unreasonable that they should be subjected to personal liability for their actions in carrying out their official duties. Given the circumstances of the stand-off, and in light of the information possessed by the officers, we conclude that officers of reasonable competence, objectively assessing the situation, could believe that exigent circumstances justified a warrantless search.

Consequently, Hegarty and Ostapowicz were entitled to qualified immunity and the district court erred in entering judgment as a matter of law against them.

## C.

### Official City Policy, Custom, or Practice

The court also entered judgment as a matter of law against the city after finding that O'Brien's rights were violated as a result of city policy. My brothers are of the view, as expressed in Judge Joiner's separate opinion, that the plaintiff has carried his burden of showing that the city is separately liable. I do not agree and therefore dissent in the municipal liability issue.

The Supreme Court has held that municipalities and other local government units are "included among those persons to whom § 1983 applies." *Monell v. Department of Social Servs. of the City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). Consequently, local governments may be subject to suit for monetary damages if they violate an individual's constitutional rights. The local municipality is liable as an entity for violating constitutional rights only when it is responsible for committing the violation, not when the violation was committed solely by its employees. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). The principle of *respondeat superior* is thus inapplicable to section 1983 actions. *Id.* To prevail on a claim of municipal liability under section 1983, O'Brien must establish: 1) that he was deprived of a constitutional right; 2) that the municipality had a "policy"; and 3) that the policy was "the moving force" behind the constitutional violation. *See Monell,* 436 U.S. at 658, 98 S.Ct. at 2019.

The Supreme Court has held that a single decision by a municipality's policymaker can, under certain circumstances, constitute a "policy." *Pembaur,* 475 U.S. at 480, 106 S.Ct. at 1298–99. A municipality is liable for an official's unconstitutional action only when that official is the one who has the "final authority to establish municipal policy with respect to the action ordered," *id.* at 481, 106 S.Ct. at 1299; and the official has made "a deliberate choice to follow a course of action ... from among various alternatives," *id.* at 483, 106 S.Ct. at 1300. "Mere authority to exercise discretion while performing particular functions does not make a municipal em-

ployee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland,* 988 F.2d 649, 655 (6th Cir.) (citing *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988)), *cert. denied,* —— U.S. ——, 114 S.Ct. 90, 126 L.Ed.2d 57 (1993). "Discretion to act is not to be confused with policymaking authority; no municipal liability results where an official merely has discretion to act because subjecting a municipality to liability in such a situation would be 'indistinguishable' from *respondeat superior* liability." *Feliciano,* 988 F.2d at 656 (citation omitted).

It is undisputed that Hegarty and Ostapowicz authorized the probes, and we already have concluded that the probes violated O'Brien's constitutional rights. Consequently, the city may be held liable if the officers' decision not to seek a warrant was the final policy of the city. *See id.* at 655. According to the city, the decision to not seek a warrant was not a policy or custom of the city and was merely the discretionary decision of Hegarty and Ostapowicz.

Whether an official has "final policy making authority" is a question of state and local law. Thus, to determine whether such final authority is vested in a particular official, this court must look to state and local statutes, ordinances, and regulations, as well as to local practice or custom. *Praprotnik,* 485 U.S. at 125, 108 S.Ct. at 925. Also, the action must have been taken pursuant to a policy adopted by an official responsible under state law for making policy in that area of the state's business. *Id.*

The City Charter of Grand Rapids provides that the city manager "shall have supervision, charge and control of the police" and that all city police officers "shall have and possess the power and authority usually conferred upon metropolitan police." Grand Rapids City Charter, Title VI, § 96(a), (g). The police department's Manual of Procedures includes a written "Response to Critical Incidents" procedure that is used by the department. According to Hegarty, he helped develop the written procedures, which the police department adopted as written

policy. The procedure manual does not define a "critical incident" but suggests that such incidents include "barricaded suspect and hostage situations." Part X, ¶ E of the manual states:

> Probes of the incident premises should be made upon direction of the tactical commander only. Probes are intended to collect intelligence and must be done without drawing attention of the suspects. Two or more tactically trained officers will conduct the probes at times and locations specifically directed.

The manual provides no guidelines, however, as to when officers should attempt to obtain search warrants, and, perforce, does not explicitly authorize searches to be conducted during critical incidents, with or without a warrant.

Although Hegarty testified that he was vested by the city with final decision making authority as to when and under what circumstances arrest and search warrants would be obtained, and regarding how the police would respond to critical incidents, he also testified, as Ostapowicz did, that all officers on the force have discretion to decide when to seek a warrant. According to Ostapowicz, although he agreed that there was no policy or practice of the police department whether to seek search warrants during a critical incident, the department did not have a policy of not seeking warrants. Hegarty and Ostapowicz testified that they would have requested a warrant during the critical incident involving O'Brien if they had determined that a warrant was required.

O'Brien offers no evidence of regulations or procedures indicating that the city has delegated authority to the chief of police to make a *final* policy decision regarding when to obtain search warrants. *See Feliciano,* 988 F.2d at 655. Although Hegarty arguably was a policymaker, not all of his decisions, particularly not those made on a case-by-case or incident specific basis, constitute municipal policy. Hegarty acts as a policymaker of the city when he sets policy for the police department, but ordinarily, when he makes investigative and enforcement decisions in individual cases pursuant to established policy, he is then only exercising the discretion

granted him under the policy. In this case, he exercised his discretion under the "Response to Critical Incidents" policy of the department to order the probes without first obtaining a search warrant. The testimony was that all officers of the Grand Rapids Police Department have discretion to determine, in individual cases, whether to seek a warrant; thus, the chief of police, who was acting as the *de facto* command officer supervising this incident, had the same discretionary authority as other officers on the force to determine whether to seek a search warrant.

There is no evidence, aside from Hegarty's rank, to suggest that the decision to proceed without seeking a warrant was taken because of the existence of a municipal policy not to do so in cases of this character. Because Hegarty and Ostapowicz decided to proceed without a warrant in the exercise of their discretionary authority, and not as a matter of municipal policy, I believe the court erred in entering judgment against the city.

### III.

We **AFFIRM** the judgment entered as a matter of law against the City of Grand Rapids, **REVERSE** the judgments as to Hegarty and Ostapowicz, and **REMAND** the case with instructions to the district court to enter judgment for Hegarty and Ostapowicz.

JOINER, Senior District Judge, concurring and writing separately in Part II B (qualified immunity), and writing for the majority as to the liability of the City of Grand Rapids (discussed in Part II C in Judge Ryan's opinion).

I concur in Parts II A and B of Judge Ryan's thoughtful opinion. I agree that the warrantless use of probes violated Joseph O'Brien's Fourth Amendment rights, but also conclude that the circumstances of this case indicate that the officers are protected by qualified immunity. These same circumstances, however, lead me to conclude that the City of Grand Rapids is liable under 42 U.S.C. § 1983 for the violation of O'Brien's

constitutional rights. For this reason, I do not join in Part II C of Judge Ryan's opinion.

### I.

The development of a critical incident procedure was one of the first priorities for the City of Grand Rapids in 1981. Retired Captain Frank Bolz of the New York Police Department, who was viewed as the national authority on the management of critical incidents, was hired to assist in this endeavor. Bolz was asked to review the draft of the procedure, and to "tear it apart." The critical incident procedure did not mention the necessity or advisability of obtaining warrants during the management of a critical incident. Bolz reviewed the manual and testified that the procedures were "very, very good. I approved them, no problems at all."

The Grand Rapids Police Department conducted three-day training programs in 1982, 1983 and 1984 for its command staff, tactical personnel, and negotiators involved in critical incident management. Bolz conducted this training, although some officers also were sent to other seminars regarding critical incident management. Bolz testified that he instructed police officers regarding the circumstances under which they are permitted to break windows or engage in other physical assaults on homes during critical incidents, teaching that such action is in conjunction with a continuing arrest, and that the warrant requirement set forth in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), does not apply. According to Bolz, there is no need to seek a warrant even when a critical incident lasts as long as two days. Bolz testified that the key to the warrant requirement is whether the police are trying to locate evidence to use against a suspect. The use of a probe to locate an individual in his home or to better hear what is going on in the home involves neither a "search" nor a "seizure," even when the police break a window to insert the probe.[1]

---

**1.** Bolz further testified that a warrant was never sought in any of the critical incidents to which he responded while still an active member of the police force. Bolz responded to approximately

400 critical incidents during the course of his career, and was involved as a negotiator in approximately 285.

Consistent with Bolz' views on the limited scope of the Fourth Amendment's warrant requirement, Police Chief Hegarty candidly testified regarding why no warrant was sought prior to using probes on O'Brien's house.

Q. You never conferred with the prosecuting attorney and his staff at any time before these events were taking place, did you?

A. There was no need to, sir, because *it was our routine practice* in our department, in terms of this kind of practice, *to not acquire a search warrant.*

(Emphasis added.) Hegarty's testimony is unequivocal on this point. He confirmed that the reason why a warrant was not sought had nothing to do with insufficient time; lack of personnel; lack of access to a prosecutor; the unavailability of a judge; or any emergency that was going on at O'Brien's house, other than the fact that O'Brien had been determined to be a barricaded suspect. Rather, it was the routine practice during the course of critical incidents to not acquire a warrant. Hegarty further explained that because there was never any intent to physically search the house, and because the police were involved in a critical incident response, the need for a warrant did not exist. Hegarty's reasons for not seeking a warrant during the events at issue are consistent with the police department's general practice in these situations: warrants were never sought during the course of previous critical incidents which themselves did not arise out of an attempt to execute a warrant. Ostrapowicz testified that, while he agreed generally with Hegarty's testimony, he did not believe that the department had a policy of not obtaining warrants during critical incidents. According to Ostrapowicz, the law guides whether a warrant should be sought, and each member of the force has the discretion to seek a warrant if he determines that one is necessary.

Hegarty testified that, as chief of police, he was vested by the city with the final decision making authority to determine the circumstances under which warrants should be obtained, and the manner in which the critical incident procedure would be carried out.

Hegarty confirmed that his decisions in these areas represented the final decisions of the city. At trial, counsel for the city argued that the county prosecutor, not the chief of police, had the final decision making authority regarding the circumstances under which warrants should be sought. This "dubious claim," as characterized by the trial court, was never substantiated by the city, and is not advanced on appeal. Significantly, the city did not contend at trial, as it does now on appeal, that because its charter identifies the city manager as the individual with supervision of the police department, that person, and not the chief of police, is the city's policymaker with respect to the acquisition of warrants.

## II.

With these salient facts as my focus, I add in support of Part II B of Judge Ryan's opinion my perception that protection against terrorism has become a necessary component of the training given to police officers. The problems posed by terrorism create a new dimension in police training. In this new kind of police work, line officers' ability to rapidly react in different and dangerous situations is critical. They must be able to follow their training and the law. We as a society hope, and perhaps expect, that law enforcement officers can quickly resolve a volatile situation without injury or death, whether that situation involves politically motivated sociopaths or, as was apparently the case here, a disturbed and isolated young man.

The actions of the two individual defendants, Police Chief Hegarty and Lieutenant Ostrapowicz, comported with Captain Bolz's teachings, as well as the department's routine practice in such situations. In light of this standard, their actions were objectively reasonable. With respect to qualified immunity, the question is whether reasonable officers would have responded as Hegarty and Ostrapowicz did in light of their training, the department's practices, and the specific challenges posed by the critical incident in which they were involved. It was not unreasonable for Hegarty and Ostrapowicz to have responded as they did in this case, thus man-

dating the conclusion that they are protected by qualified immunity. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

The problem was the policy, practice or custom of the City of Grand Rapids. However, we will not impose liability on the officers who carried out that policy, practice or custom, on the facts of this case. The policy, practice, or custom was taught by a national authority on the management of critical incidents, a person upon whom it was not unreasonable to rely. The officers' response, which did not vary from the policy, practice, or custom, entitles them to qualified immunity.

## III.

■ Grand Rapids is not entitled to make a policy that violates the law, and then claim that it is not liable because a national authority says that the policy is legal. The city's policy must not violate the law. Judge Ryan has clearly pointed out how actions in accordance with the procedure taught by Bolz violated O'Brien's Fourth Amendment rights. Therefore, if these policies are the policies of Grand Rapids, then Grand Rapids is liable.

The law protects cities in a different way than it protects agents or employees of a city. The latter are protected by a doctrine of qualified immunity when they act in an objectively reasonable fashion. As to them, the question is one of reasonableness, in light of their teaching, the facts, and the law. The city is not entitled to the leeway of such protection. However, the law requires special care in making certain that the policies and procedures the city establishes and recommends to its agents and employees, or the customs that it tolerates, fairly represent official policies. Respondeat superior is not enough.

Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v. New York City Dep't of Soc. Serv.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978).

To satisfy the policy requirements of *Monell,* a plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't,* 8 F.3d 358, 364 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994) (quoting *Coogan v. Wixom,* 820 F.2d 170, 176 (6th Cir.1987). Under *Monell,* a "custom"

> is a legal institution that is permanent and established, but is not authorized by written law.... Before a custom can be the basis for a civil rights violation, the custom must be "so permanent and well settled as to constitute a 'custom or usage' with the force of law."

*Feliciano v. Cleveland,* 988 F.2d 649, 655 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 90, 126 L.Ed.2d 57 (1993) (quoting *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036). Plaintiff has met these standards.

The official policy proved at trial was the decision to follow the teachings of Captain Bolz and to adopt his philosophy in developing a response plan for critical incident management. Recognizing the need for a cohesive procedure to address one of the most crucial problems facing modern law enforcement, Grand Rapids turned to Captain Bolz to teach its officers and critique its new procedure manual. Bolz worked with the Grand Rapids Police Department for four years in formulating the response plan. In his training sessions, Bolz instructed the city's officers that warrants were not required in critical incidents, making no distinction between the varying circumstances that could be presented. In accordance with his teachings, the procedure manual was drafted to be silent on the general warrant requirement of the Fourth Amendment. In accordance with his teachings, Grand Rapids followed the routine practice of not securing warrants during the management of critical incidents. The trouble is that this policy was illegal.

The connection between the City of Grand Rapids and the policy also was demonstrated.

The record reflects that resources were deliberately allocated to the development of a critical incident response plan, involving the hiring of Bolz, multiple-day training sessions for police staff, and the development of a written procedure manual. It would be wrong to assume that this demonstrated commitment of money and personnel, over a period of four years, was that of renegades acting in an ultra vires capacity. It must be remembered that the response plan which evolved from these efforts concerned the need for effective means of protecting innocent citizens of the City of Grand Rapids in perhaps the most challenging and threatening of circumstances.

These facts established a policy of the City of Grand Rapids. A plaintiff, in a case such as this, is not required to anticipate the argument that the express approval of persons, never identified at trial, was required in order to make the operative policy the "official" policy. Thus, on the record before us, it is not enough for the city to attempt to negate the official character of the policy in question by pointing to some obscure charter provision that identifies the supervisor of the department whose conduct gave rise to the suit. If there is a genuine issue in dispute, we must not only look at the provisions of the charter, but also must examine the knowledge and actions of these persons in the development of the policies.

Even when pointedly interrogated by the trial judge, the city presented neither evidence nor legal argument that any person or governmental body had the authority to intervene in the development of the response plan, or to guide, structure or veto its terms. Nor did the city demonstrate that the plan required the imprimatur of a certain official or governmental body before it could be employed. No evidence was presented indicating that in any previous critical incident response the "city," or any specific person in authority, directed or suggested that the critical incident procedure followed in this case was not accurate. The city contends, for the first time on appeal, that because its manager is the supervisor of the police department, no city policy could evolve from the department's deliberate and concerted actions without the manager's approval. In the absence of any evidence whatsoever, the city would have this court assume that the manager did not approve of the response plan as developed and employed. This we will not do.

The question presented in this case is whether the trial court's grant of plaintiff's motion for judgment as a matter of law under Fed.R.Civ.P. 50(a)(1), made after both sides had rested, must be reversed. In making this determination, this court must view the evidence in the light most favorable to the party opposing that motion, and give that party the benefit of all reasonable inferences. The rule does *not* instruct that the party opposing the motion should have the benefit of arguments not made and evidence not presented. The record in this case demonstrates that there were no controverted issues of fact upon which reasonable persons could differ on this issue, and that the trial court's decision to impose liability on the city was correct.

The third element of plaintiff's case required him to demonstrate that he was injured because of the execution of the policy. This issue merits only the briefest mention, as even the city does not seriously contend that what we have held to be the invasion of plaintiff's Fourth Amendment rights did not flow from the response plan as developed and implemented.

In sum, I would conclude that O'Brien satisfied his burden of proof with respect to the liability of the City of Grand Rapids, and affirm the judgment against the City of Grand Rapids.

KEITH, Circuit Judge, concurring in part and dissenting in part.

I concur in Part II A of Judge Ryan's opinion, which found the warrantless use of probes violated O'Brien's fourth amendment rights, and in Part III of Judge Joiner's opinion, which found the City of Grand Rapids liable for violating O'Brien's constitutional rights under 42 U.S.C. § 1983. Because I disagree with the majority's analysis of qualified immunity with respect to the officers, I respectfully dissent as to Part II B of Judge Ryan's opinion and Part II of Judge Joiner's opinion.

Reasonable officers realize a warrantless search absent an exceptional situation, such as exigent circumstances, violates the fourth amendment. Reasonable officers would agree in this situation no exigency existed. Describing the unacceptable and outrageous actions taken by officers in this case as "reasonable" offends the competency and professionalism practiced by the overwhelming majority of officers across the nation. Recognizing O'Brien presented "no overt, hostile threat" and there was no probable cause to believe he committed any crime, only unreasonable and overzealous officers would harass and persecute O'Brien by surrounding his home and breaking its windows. In this case, the officers' refusal to obtain a warrant from a neutral and detached magistrate, despite the passing of several hours, resembles the self-righteous arrogance of a lynch mob. Unfortunately, the officers' overactive imaginations, irrational paranoia and aggressive conduct incited a scenario which left O'Brien paralyzed. It is precisely this type of situation the fourth amendment is intended to prevent. I would therefore **AFFIRM** the district court's finding that the officers were not entitled to qualified immunity.