Margaret WOODS, Plaintiff–Appellant,

v.

Robert LECUREUX, et al.,
Defendants–Appellees.

No. 95–2017.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 24, 1996.

Decided April 8, 1997.

---

Roger K. Timm (argued and briefed), James C. Partridge, Dykema Gossett, Detroit, MI, for Margaret Woods.

E. Michael Stafford, Asst. Attorney General, Donald L. Allen (argued and briefed), Office of the Attorney General, Corrections Division, Lansing, MI, for Robert Lecureux.

Donald L. Allen (argued and briefed), Office of the Attorney General, Corrections Division, Lansing, MI, for Art Tressmer, Rick Faust, Tom Doty.

Before: WELLFORD, DAUGHTREY, and MOORE, Circuit Judges.

MOORE, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. WELLFORD, J. (pp. 1226–27), delivered a separate opinion concurring in part and dissenting in part.

MOORE, Circuit Judge.

Plaintiff–Appellant Margaret Woods appeals from the district court's order granting judgment as a matter of law in favor of both defendants in this § 1983 action brought on behalf of her deceased son, Larry M. Billups, who was murdered while incarcerated in the Michigan prison system. Woods contends that the defendants, Michigan prison officials, violated her son's Eighth Amendment rights by failing to prevent his murder. We affirm in part and reverse in part.

## I. BACKGROUND

Larry Billups was murdered on May 15, 1989, while he was returning to his cell after breakfast at the State Prison of Southern Michigan ("SPSM"), in Jackson, Michigan. The assassins, known members of the Melanic Islamic Palace of the Rising Sun ("the Melanics"), a prison organization, stabbed

Billups, also a member of the Melanics, in the neck with a prison-made knife. Billups managed to run down two flights of stairs before collapsing and ultimately bleeding to death. He had been at SPSM for only ten days. Prior to his stay there, he was incarcerated at Kinross Correctional Facility ("KCF"), in Michigan's Upper Peninsula. On April 18, 1989, while still at KCF, Billups was implicated along with several other prisoners in the assault and robbery of his roommate, Morris Barlow. Immediately after that incident, Billups was placed in a segregation unit. Because of the assault, he soon received an "increased custody transfer" to SPSM. J.A. at 704.

Appellant contends that Billups was murdered as a direct result of his involvement in the attack on Barlow. According to her, by engaging in an unauthorized assault, Billups ended up on the wrong side of the leaders ("topheads") of the Melanics, and he was then murdered pursuant to a hit contract sanctioned by one of the topheads. A document prepared by a corrections investigator with the Michigan Department of Corrections essentially confirms these contentions. *See* J.A. at 675, 679.

Although appellant's complaint originally named as defendants numerous Michigan prison officials, she subsequently voluntarily dismissed all of them except Art Tessmer, the Deputy Warden of Security at KCF, and John Jabe, the Warden at SPSM. The crux of appellant's argument against Tessmer is that he knew of the dangers facing Billups as a result of Billups's participation in the assault on Barlow, but, due to his deliberate indifference, failed to inform the proper authorities at SPSM of these dangers. As for Appellee Jabe, appellant contends that he knew of an unacceptably high risk to prisoners housed in 6-Block, the area in which Billups resided at SPSM, but failed to take the steps to reduce that risk.

The case proceeded to trial. After appellant rested her case, the district court granted both defendants' motions for judgment as

a matter of law pursuant to Federal Rule of Civil Procedure 50. The court found that even if Tessmer had known of the dispute between Billups and the Melanics, his failure to act upon that knowledge "might reasonably be characterized as negligent, but certainly not as deliberately indifferent, wanton, or obdurate." District Ct.Op. at 3; J.A. at 68. In granting Jabe's motion, the court stated that "[t]here is no evidentiary basis for a jury finding deliberate indifference or wanton or obdurate behavior on the part of defendant Jabe." District Ct.Op. at 4; J.A. at 69. In addition to appealing both of these conclusions, appellant contends that the district court erred in four of its evidentiary rulings. We turn first to the evidentiary issues.

## II. EVIDENTIARY ISSUES[1]

### A. Exclusion of *Michigan* Evidence

 Appellant alleges that the district court erred by excluding various parts of the record, including documents and exhibits, from the ongoing case of *United States v. Michigan*. We review the district court's exclusion of this evidence for abuse of discretion. *See Muzquiz v. W.A. Foote Mem'l Hosp., Inc.*, 70 F.3d 422, 428 (6th Cir.1995).

The *Michigan* case began in 1984, when the United States Department of Justice sued the State of Michigan and various state officials in their official capacities pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 (1994). The complaint challenged numerous prison conditions in the Michigan system. Contemporaneous with the filing of the complaint, the United States filed a motion to dismiss and to enter a proposed consent decree that it had agreed upon with the State of Michigan. The consent decree was subsequently entered by the district court. Since then, that case has continued because of various disputes regarding the consent decree and has, in fact, reached the Sixth Circuit numerous times. *See, e.g., United States v. Michigan*, No. 90–1701, 1996 WL 382238 (6th Cir.

---

1. Of the four evidentiary issues appellant raises, the first two are the only ones that arguably could have had any impact on the district court's decision to grant judgment as a matter of law.

We will, however, briefly address the remaining two issues in light of the fact that we are reversing and remanding with respect to Appellee Tessmer.

July 3, 1996); *United States v. Michigan*, Nos. 94–2391, 95–1258, 1995 WL 469430 (6th Cir. Aug. 7, 1995); *United States v. Michigan*, 18 F.3d 348 (6th Cir.), *cert. denied*, 513 U.S. 925, 115 S.Ct. 312, 130 L.Ed.2d 275 (1994); *United States v. Michigan*, 940 F.2d 143 (6th Cir.1991).

Appellant cites to several portions of the record from *Michigan* that she feels should have been admitted in her case against Appellee Jabe. She contends that this evidence suggests that there were unconstitutional conditions at SPSM's 6–Block and that Jabe disregarded these conditions. Although the district court did not cite a specific rule when it excluded the evidence, its remarks, which focused on the possible confusion and unfair prejudice that could result from its admittance, *see* J.A. at 362–63, suggest that the court relied on Federal Rule of Evidence 403. That rule provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R.EVID. 403.

In one of the *Michigan* appeals, this circuit stated:

> Michigan denied the allegations [in the United States' complaint] and the issues were never adjudicated. Consequently the record fails to disclose the existence, scope, or degree, if any, of the asserted constitutional infringements.... The consent decree, as approved by the trial court, was intended to be "in resolution of all claims asserted and relief sought, and without a finding of liability or other determination on the merits."

940 F.2d at 155 (quoting the consent decree).

Given the nature of the *Michigan* case, if parts of the record from that dispute had been admitted in this case, the jury might have given that evidence more weight than it deserved. Moreover, the complaint in *Michigan* was filed three years before Jabe became the warden at SPSM, and the remaining portion of the case revolved around the implementation of the consent decree. It would be a daunting enough task for the district court (and possibly a jury) to determine from this material which deficiencies in the Michigan system were attributable to leadership after 1987, let alone to determine which of this material indicates that Jabe was deliberately indifferent to a substantial risk of serious harm. Because the *Michigan* material was likely to be confusing and unfairly prejudicial, and because there are no allegations that the district court otherwise restricted the evidence that could be introduced to show the risks at SPSM, the district court did not abuse its discretion by excluding all material from the *Michigan* litigation.

## B. Exclusion of "Ultimate Issue" Testimony

■ Appellant asserts that the district court abused its discretion when it prohibited her expert witness, Dr. Mintzes, from using the term "deliberately indifferent" to describe Tessmer's and Jabe's conduct. Federal Rule of Evidence 704(a) provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." This court recently has stated that "Rule 704 removes the 'general proscription against opinions on 'ultimate issues' and shift[s] the focus to whether the testimony is 'otherwise admissible.'" *United States v. Sheffey*, 57 F.3d 1419, 1425 (6th Cir.1995) (quoting *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir.1985)), *cert. denied*, —— U.S. ——, 116 S.Ct. 749, 133 L.Ed.2d 697 (1996).

■ As the advisory committee notes to Rule 704 indicate, the protections afforded by the other rules of evidence are far from hollow when ultimate issue testimony is being offered:

> The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of

an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus the question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed. McCormick § 12.

FED.R.EVID. 704 Advisory Committee Notes. It is, therefore, apparent that testimony offering nothing more than a legal conclusion—i.e, testimony that does little more than tell the jury what result to reach—is properly excludable under the Rules. It is also appropriate to exclude "ultimate issue" testimony on the ground that it would not be helpful to the trier of fact when " *the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.*' " *Sheffey,* 57 F.3d at 1426 (citation omitted) (emphasis in *Sheffey* ).

In addition to *Sheffey* 's general pronouncements, two Sixth Circuit cases have confronted the ultimate issue problem as it relates to the term "deliberate indifference." In *Heflin v. Stewart County,* 958 F.2d 709 (6th Cir.), *cert. denied,* 506 U.S. 998, 113 S.Ct. 598, 121 L.Ed.2d 535 (1992), an expert witness in a § 1983/Eighth Amendment case testified that, in his opinion, the prison officials were "deliberately indifferent" to the medical needs of a pretrial detainee. The court concluded that the district court did not commit "reversible error" by admitting this evidence. *Id.* at 715. Central to the court's conclusion was the fact that the witness "used 'deliberately indifferent' in the way an ordinary layman would to describe such conduct—to state his opinion on the ultimate fact, not to state a legal conclusion." *Id.* In *Berry v. City of Detroit,* 25 F.3d 1342 (6th Cir.1994), *cert. denied,* 513 U.S. 1111, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995), a § 1983/municipal liability case, the plaintiff's expert witness testified that the Detroit Police Department was "gross[ly] negligent" in its training of its officers and that this gross negligence was comparable to "deliberate indifference." *Id.* at 1353. The witness then

defined deliberate indifference as "[c]onscious knowledge of something and not doing anything about it." *Id.* at n. 12. Overturning a jury verdict for the plaintiff, this court held that the district court erred by admitting this testimony. We stated that " 'deliberate indifference' is a legal term" and that "[i]t is the responsibility of the court, not testifying witnesses, to define legal terms." *Id.*

*Berry* and *Heflin* shed light on the difficulty district courts face when determining whether to admit testimony that arguably amounts to a legal conclusion. Although *Heflin* indicates that district courts can exercise some discretion in determining whether the proffered testimony is helpful to the jury, *Berry* teaches that a district court abuses its discretion when it allows a witness to define legal terms, especially terms that carry a considerable amount of legal baggage.

In the present case, the rationale relied on in *Berry* is much more applicable than that in *Heflin.* The following colloquy between Dr. Mintzes and counsel for appellant demonstrates this fact:

Q. Dr. Mintzes, did you form an opinion with respect to the actions or inactions of Mr. Tessmer as they relate to Larry Billups in this matter?

A. Yes, I do [sic].

Q. And could you tell the jury what that opinion is?

A. It was my opinion that, in terms of looking at all the information, that Mr. Tessmer was what I considered, which is a legal term, deliberately indifferent to what was felt to be a known risk of harm to Mr. Billups.

Q. And when you say "deliberately indifferent," what do you mean by that?

A. Well, somebody, when somebody is considered to be deliberate—

THE COURT: I believe that you are asking the witness to testify to a legal conclusion at this point, Mr. Timm.

MR. TIMM: I'll withdraw the question, your Honor.

J.A. at 512.[2]

2. Counsel for appellant states that "Dr. Mintzes never sought to define 'deliberate indifference.' "

Appellant's Br. at 38 n.21. Given the voluminous record in this case, we will give counsel the

Testimony such as Dr. Mintzes's, which attempts to tell the jury what result to reach and which runs the risk of interfering with a district court's jury instructions, hardly can be viewed as being helpful to the jury. Moreover, as this opinion indicates in Part III, whether a prison official acted with deliberate indifference depends on that official's state of mind. Thus, by expressing the opinion that Tessmer was deliberately indifferent, Dr. Mintzes gives the false impression that he knows the answer to this inquiry, which depends on Tessmer's mental state. For a witness to stack inference upon inference and then state an opinion regarding the ultimate issue is even more likely to be unhelpful to the trier of fact. *See Shahid v. City of Detroit,* 889 F.2d 1543, 1547 (6th Cir.1989) (concluding that no abuse of discretion occurred when the district court "determined that it would prejudicially confuse the jury to hear an expert witness base his opinion of the ultimate issue on facts that were for the jury to determine."). We thus believe that the district court did not abuse its discretion by excluding Dr. Mintzes's testimony on "deliberate indifference."

### C. Use of Leading Questions

■ Appellant contends that the district court abused its discretion by allowing defense counsel continually to ask leading questions of Tessmer and Jabe. Appellant's argument is that even though the attorneys for the appellees were technically cross-examining Tessmer and Jabe, it was cross-examination in form only, not in substance.

Federal Rule of Evidence 611(c) provides: "Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." The advisory committee notes to that rule provide additional guidance on the leading-questions issue:

The purpose of the qualification "ordinarily" is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact, as for example the "cross examination" of a party by his own counsel after being called by the opponent....

FED.R.EVID. 611(c) Advisory Committee Notes.

In the present case, appellant called Tessmer and Jabe to the stand in her case-in-chief. Because they were adverse parties, leading questions were permitted on direct examination. And because what followed was technically cross-examination, the district court again allowed leading questions. To this end, the court stated, "you can raise [the leading-question] objection, but there's nothing wrong at all with [defense counsel] standing up and cross examining witnesses which you call to the stand, and I intend to be sure, if he wants to, that he continues to do that." J.A. at 520.

■ It appears that the advisory committee notes were intended to address the precise factual situation in the present dispute. The notes suggest that a district court should be hesitant blindly to authorize the use of leading questions when it is cross-examination in form only. Appellant's argument, however, loses much of its force when the specific questions at issue are analyzed. It is elementary that a leading question is one that suggests an answer. *See, e.g.,* 3 JACK B. WEINSTEIN ET AL., WEINSTEIN'S EVIDENCE, ¶ 611[05], at 611–77 (1996). Appellant points to one line of testimony involving Tessmer that, in her view, is "particularly egregious." *See* Appellant's Br. at 39–40. Unfortunately for appellant, in this line of questioning, Tessmer responds to one of the questions by stating, "I really don't know how to answer that," and he responds to another by stating "I'm not quite sure I understand." Far from suggesting an answer to the witness, this "particularly egregious" line of questioning confused the witness such that he did not even know what the question was. Moreover, a district court's decision to allow leading questions when a party is cross-examining his own witness is a "matter ... within the court's traditional discretion to control the mode of interrogation," *Morvant v. Con-*

---

benefit of the doubt and assume that this state-

ment was a mere oversight on his part.

*struction Aggregates Corp.*, 570 F.2d 626, 635 (6th Cir.), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978), and we review that decision only to determine whether there has been a clear abuse of discretion. *See Chonich v. Wayne County Community College*, 874 F.2d 359, 368 (6th Cir.1989). We are convinced that in the present case, no clear abuse of discretion occurred.

### D. Exclusion of Evidence on Damages

■ Appellant also contends that the district court abused its discretion by excluding the nonexpert testimony of Dana Billups, Mr. Billups's sister, regarding future earnings. Appellant wanted to introduce, through Ms. Billups, a chart that estimated Mr. Billups's wage progression after he would have been released from prison. The district court excluded this evidence because it found the evidence to be based upon speculation and thus likely to be unfairly prejudicial. J.A. at 405. The district court's findings are buttressed by the fact that the only foundation in the record for the projections in the proffered exhibit is that Mr. Billups was planning to take up plumbing or some other trade upon his release from prison. We find no abuse of discretion in the exclusion of this evidence.

### III. EIGHTH AMENDMENT ANALYSIS

Judgment as a matter of law is proper "[i]f during a trial by jury, a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue[.]" FED.R.CIV.P. 50(a)(1). When reviewing an order granting judgment as a matter of law, "this court should not weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury; rather, this court must view the evidence in the light most favorable to the party against whom the motion is made and give that party the benefit of all reasonable inferences." *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir.1994).

■ To establish liability under the Eighth Amendment for a claim based on a failure to prevent harm to a prisoner, appellant must prove that appellees acted with "deliberate indifference" to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994); *Helling v. McKinney*, 509 U.S. 25, 32, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993); *Street v. Corrections Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996); *Taylor v. Michigan Dep't of Corrections*, 69 F.3d 76, 79 (6th Cir.1995); *Hill v. Marshall*, 962 F.2d 1209, 1214 (6th Cir.1992), *cert. denied*, 509 U.S. 903, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993). This test involves both a subjective and objective component. The objective component requires that the deprivation alleged must be " 'sufficiently serious.' " *Farmer*, 511 U.S. at 834, 114 S.Ct. at 1977 (citation omitted). "For a claim ... based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* To satisfy the subjective requirement, appellant must show that the appellees had " 'a sufficiently culpable state of mind.' " *Id.* (citation omitted). In *Farmer*, the Court resolved a conflict among the circuits as to whether a prison official could be deliberately indifferent without possessing actual knowledge of a substantial risk of serious harm, when it stated:

> We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837, 114 S.Ct. at 1979. Thus, the deliberate indifference standard "describes a state of mind more blameworthy than negligence." *Id.* at 835, 114 S.Ct. at 1978. *See also Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) ("To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety."). With this backdrop in mind, we now turn to the facts presented at trial to determine

whether judgment as a matter of law was proper with respect to Appellees Tessmer and Jabe.

## A. Appellee Tessmer

Appellee Tessmer's primary argument is that he was without knowledge of any risk faced by Billups. Our task, therefore, is to determine whether a reasonable jury could have found that Tessmer had knowledge of the facts surrounding the assault on prisoner Barlow and the risk faced by Billups resulting from this assault. The answer to this question depends on whether Tessmer received the "Vink Report" and whether that report provided sufficient information concerning the risks faced by Billups.

Following the assault on Barlow, Tessmer ordered Prison Inspector Erik Vink to investigate the incident. Vink then conducted interviews with three prisoners who had knowledge of the assault. Vink never prepared an actual report from his discussions with the various prisoners; the "Vink Report" is merely the term used by the parties to describe the transcripts that resulted from Vink's interviews with each prisoner. Tessmer testified that he could not recall receiving the report, and that after a thorough search through his files, he could not find the report. J.A. at 488. However, Vink testified that "what I did was send the report in to [Tessmer]." J.A. at 569. In addition, he stated that after he sent the report, he talked to Tessmer about the report, although he could not remember what was said. J.A. at 570.

We believe that Vink's testimony raises a genuine issue of material fact as to whether Tessmer received and had knowledge of the contents of the report. *See Farmer*, 511 U.S. at 842, 114 S.Ct. at 1981 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence...."). This conclusion, however, does not end our analysis. The ultimate issue is not whether Tessmer had knowledge of the Vink Report but whether he had knowledge of a substantial risk of serious harm facing Billups. To answer this question we must turn to the

Vink Report itself to determine whether a reasonable jury could find that it discloses such a risk.

The first prisoner interviewed by Vink stated that he had witnessed the assault on Barlow and that on the day following that assault he himself was stabbed. J.A. at 657. He then stated that the tophead Melanics "was kind of upset" about the unauthorized assault and "had a few words with Billups." J.A. at 658. Moreover, he gave an affirmative answer to the question "[The Melanics] were mad at Billups because he had part in [the assault] against Barlow?" J.A. at 658. The other two prisoners both stated that the first prisoner was stabbed in retaliation for his participation in the Barlow assault. J.A. at 683, 696. The Vink Report thus contains evidence that one of the prisoners participating with Billups in the Barlow assault was stabbed the following day by the tophead Melanics for his participation in the assault and that the topheads were angry at Billups as well.

Evidence also was admitted at trial suggesting that if Tessmer reviewed the Vink Report, he had a duty to take further action. Tessmer himself admitted that had the report been received, further investigation would have been warranted. J.A. at 493–94. In addition, appellant's expert witness, Dr. Mintzes, testified that, assuming Tessmer received the Vink Report, he had a duty to make that information available to SPSM because the report contained "potentially critical" information. J.A. at 524–25.[3] According to Dr. Mintzes, the violent nature of the Melanics, as well as their ability to communicate across prison lines, was well known. J.A. at 526, 529. And Dr. Mintzes viewed the stabbing of the first prisoner mentioned in the Vink Report as "further evidence of the fact that if one got on the wrong side of the Melanics, ... one tended to incur the possibility of great physical jeopardy." J.A. at 527.

Tessmer contends the Vink Report was unreliable. He points to his testimony at trial that the report provided an insufficient basis for him to have taken specific action. J.A. at 493. In addition, Inspector Vink

---

**3.** Dr. Mintzes served as Warden at KCF from 1977 to 1980 and at SPSM from 1980 to 1982.

testified that two of the witnesses were not particularly credible. J.A. at 556, 562. Tessmer's interpretation of the Vink Report is not unreasonable. Parts of the report are murky and other parts focus on issues unrelated to Billups. Indeed, Tessmer's interpretation of the Vink Report ultimately may prove to be correct. We are not allowed, however, to "weigh the evidence" or "evaluate the credibility of witnesses" when reviewing a motion for judgment as a matter of law. *O'Brien*, 23 F.3d at 995. Given the substance of the Vink Report, Dr. Mintzes's testimony, and Tessmer's own admission, we believe a question of fact exists as to whether the Vink Report disclosed a substantial risk of serious harm to Billups.

██ Apart from the Vink Report, Tessmer contends that he was not deliberately indifferent to a substantial risk of serious harm because when Billups met with him prior to Billups's transfer, Billups failed to disclose any risk of harm. Even assuming this assertion is true, warnings from the prisoner himself are not required when other evidence discloses a substantial risk of serious harm. *See Farmer*, 511 U.S. at 848, 114 S.Ct. at 1984 ("[T]he [prisoner's] failure to give advance notice [to prison officials] is not dispositive. Petitioner may establish respondents' awareness by reliance on any relevant evidence."). In this case, as we just concluded, other relevant evidence established a question of fact as to whether Tessmer received the Vink Report and whether that report disclosed a substantial risk of serious harm to Billups.

If the trier of fact resolves both of these questions of fact in favor of appellant, it still must determine whether Tessmer had actual knowledge of the risk facing Billups. The Court in *Farmer* emphasized the importance of the actual knowledge requirement:

> Because ... prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety. That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so. Prison officials charged with deliberate indifference might show, for example, that

they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.

511 U.S. at 844, 114 S.Ct. at 1982. Because we are in no position to discern Tessmer's state of mind from the record before us, a question of fact exists regarding this issue as well.

We recently stated in *Street v. Corrections Corp. of Am.*, 102 F.3d 810 (6th Cir.1996), that summary judgment is inappropriate when "there are issues of fact as to whether [a defendant in a § 1983/Eighth Amendment case] was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]' and whether he actually 'dr[e]w the inference.'" *Id.* at 816 (quoting *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979). Because questions of fact exist in the present case based on evidence admitted at trial as to whether Tessmer had knowledge of the Vink Report, whether that report disclosed that Billups faced a substantial risk of serious harm, and whether Tessmer actually drew the inference of that risk, we conclude that the district court improperly granted Tessmer's motion for judgment as a matter of law.

### B. Appellee Jabe

██ Appellant contends that John Jabe, the Warden at SPSM, was also deliberately indifferent to a substantial risk of serious harm to Billups. In contrast to the claim against Tessmer, appellant does not contend that Jabe had knowledge of the specific risk faced by Billups from the tophead Melanics. Indeed, Jabe was never even at SPSM when Billups was, because he was on sick leave for a hip replacement from April 10, 1989, through June 18, 1989. Instead, appellant claims that Jabe knew of an unacceptably high level of risk facing prisoners in 6–Block, the area in which Billups resided, but disregarded that risk.

Appellant asserts that the testimony presented at trial established a question of fact regarding Jabe's knowledge of the risk facing Billups and Jabe's response to that risk.

Jabe testified that he was aware that knives were being made by prisoners at the metal shop inside the prison. J.A. at 425. In addition, he knew that there was going to be a 100% change in the make-up of the prisoners in 6–Block and that such changes often created increased prisoner-on-prisoner violence. J.A. at 415. Dan Bolden, who, as the deputy director of the correctional facilities administration of the bureau of prisons for the Michigan Department of Corrections, was Jabe's boss, testified that they were planning on minimizing the effects of the change at 6–Block by assigning "one of the best deputy wardens the department had ever had," Wayne Jackson, to supervise the process. J.A. at 399. Jackson, however, was arrested for bribery, and much of his staff was interrogated by law enforcement agents during the change-over period, causing a significant impact on the planning and implementation of the population change. J.A. at 399–401. Jabe testified that he anticipated an increase in the level of violence as a result of this population change. J.A. at 415. When Dr. Mintzes was asked why the level of violence at SPSM was so large, he focused on the following factors: the size of the prison; the number of prisoners; the changes at 6–Block; the arrest of Jackson; inadequate staffing; and the number of prisoners who would move together at a time. J.A. at 534–546. He also indicated that Jabe's decisions regarding staffing levels and Jabe's deficiencies with regard to the monitoring of knives made it more likely that a prisoner would be harmed. J.A. at 548. Before going into all of these details, he also indicated that "there was a known risk of harm to Mr. Billups and that Mr. Jabe tended to be indifferent to what was the risk of harm to him." J.A. at 513.

On cross-examination, Dr. Mintzes conceded that Jabe had taken many steps to increase security at SPSM. J.A. at 341. Indeed, he stated that he commended many of the actions taken. J.A. at 340, 343, 345, 353. One of the actions for which he commended Jabe was an increase in staffing. J.A. at 344. He agreed that these actions taken by Jabe do not seem like actions that would be taken by someone who was not concerned with the safety of the prisoners. J.A. at 345. In addition, he agreed that officials at SPSM were making a concerted effort to reduce the flow of weapons. J.A. at 356. As a prior warden at SPSM, he testified as to how it was "a very complex and very arduous process" to get funding to make the necessary changes. J.A. at 358. He also stated that Jabe was not at fault for the bad timing in having to have his hip replaced and losing his top deputy at the time of the changes at 6–Block. J.A. at 360. Of equal importance, he testified that in spite of the short-term security problems with the changes at 6–Block, such changes were intended to—and in fact did—increase security at SPSM. J.A. at 361.

Given all of the evidence in the record, the district court did not err in concluding that Jabe did not deliberately disregard a substantial risk of serious harm to Billups. While there may be situations in which a jury could reasonably conclude that a prison official on sick leave acted with deliberate indifference toward a prisoner injured during his absence, the present dispute certainly does not present one of those situations. Although Jabe does not deny that SPSM housed violent prisoners and that violence among the prison population would sometimes occur, this fact does not establish an Eighth Amendment violation. *See Gibson v. Foltz,* 963 F.2d 851, 854 (6th Cir.1992) ("The fact that the defendants knew that SPSM housed many violent prisoners and that prison violence did occur is not sufficient to constitute deliberate indifference."). Moreover, the evidence presented in this case indicates that since he took over as warden at SPSM on May 1, 1987, Jabe continually attempted to improve the prison conditions. There is simply nothing in the record indicating that Jabe did not respond reasonably to the risks at SPSM. *See Farmer,* 511 U.S. at 844, 114 S.Ct. at 1982–83 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). Although Dr. Mintzes testified that Jabe was indifferent to a known risk of harm, we cannot find any evidence in the record supporting this opinion. We conclude, therefore, that the district court properly granted Appellee Jabe's Rule 50 motion for judgment as a matter of law.

For the foregoing reasons, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings consistent with this opinion.

HARRY W. WELLFORD, Circuit Judge, concurring in part and dissenting in part.

I am in full agreement with Judge Moore in all respects save the discussion about defendant Tessmer. I therefore **DISSENT** in the reversal of the district court's grant of summary judgment to defendant Tessmer.

The majority correctly concludes that the case against deputy warden Tessmer at least preliminarily depends on whether there was sufficient evidence for a jury to reasonably infer that he had received the so-called "Vink Report." In looking at all of the proof in the record, however, I have serious reservations about joining the majority in singling out one piece of potentially contradictory evidence as a basis for concluding that Tessmer should have received the Vink Report.

The record shows that deputy warden Tessmer testified without qualification that he had never received or even seen the Vink Report, and indeed it could not be found in Billups' file. I would concede that Eric Vink, the prison official that Tessmer assigned to investigate the initial assault on inmate Barlow and the subsequent stabbing inmate Rogers, did indicate that he sent the report to Tessmer. Nevertheless, Vink was unable to remember definitively when he sent the report or whether he had ever discussed it with Tessmer personally. In any event, he was unable to recall the content of any such conversation. Furthermore, the record indicates that as a matter of procedure, a transfer of documents to Tessmer would generally be recorded in a logbook, and the Vink Report was not so recorded. Although I am mindful of the majority's warning to refrain from "weighing the evidence" at this stage in this case, I am also aware that judgment as a matter law is not a hollow procedure either. There is, in my view, a serious question about whether a reasonable jury could infer that Tessmer ever actually received any of the information garnered by Vink.

Even assuming that we could presume that deputy warden Tessmer received the Vink Report, I have some question about whether the report would necessarily raise an obvious red flag of warning about Billups' safety, especially at another prison. This observation is important since there is no direct evidence of any culpable state of mind on Tessmer's part. As our court has explained, a plaintiff may still prevail when there is no direct evidence, but it must demonstrate circumstantially that the risk of harm to the inmate was so obvious that it would be reasonable for a jury to conclude that an official knew of and disregarded it. *See Brooks v. Celeste*, 39 F.3d 125, 129 (6th Cir.1994). As noted above, however, my reading of the Vink Report does not lead me to conclude that a reasonable jury could find an obvious risk.

As a preliminary matter, it is important to note that the Vink Report is not really a report *per se*, but was instead a mere collection of prisoner interviews conducted by Eric Vink. Further, the transcripts and notes of these interviews are, in my opinion, confusing and inconsistent at best. Much of the content of the interviews is irrelevant and incoherent, and at least one of the interviewees refused even to sign his statement. In any event, the plaintiff argues that the interviews cumulatively suggest that the "topheads," or leaders of the Melanics, had not authorized the "hit on Barlow and that they were unhappy about it." In fact, the plaintiff points out that another inmate, Rogers, had been stabbed prior to Billups, and that at least two prisoners attributed the stabbing to Rogers' participation in the assault on Barlow. However, Rogers himself did not believe that was the reason he was stabbed. In contrast, he indicated simply that the Melanics were a gang that was into the drug business and that he felt that he was assaulted "because [he] stepped out from being a Melanic." In my opinion, when examined as a whole in context, these circumstances do not suggest that an obvious risk to Billups' safety existed. After all, despite being privy to prison gossip, no inmate indicated that he was aware of any threat made toward Billups, or even Rogers.

Notwithstanding the paucity of this information, the majority asserts that Tessmer himself admitted that further investigation would have been warranted if he had in fact received the reports. In looking carefully at

his testimony, however, it is apparent that the majority's characterization is somewhat of an exaggeration. In fact, Tessmer stated only that he would have asked Billups about the situation, which did in fact occur anyway, and even then, Billups did not indicate any concern for his own safety.

Ultimately, I find that the district court's opinion properly took into account the meaning of "deliberate indifference" as that term has been defined by the Supreme Court and this court in the prison context. *See Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Marsh v. Arn,* 937 F.2d 1056 (6th Cir.1991). As *Farmer* makes clear, the Eighth Amendment requires a "sufficiently culpable state of mind," which is more than mere negligence. *Id.* at 834, 114 S.Ct. at 1978. In *Marsh,* we emphasized further that a plaintiff must establish "obduracy and wantonness not inadvertence or error." *Id.* at 1060. I find that even giving the plaintiff the benefit of favorable inferences, no reasonable jury could conclude on the basis of all of the evidence that Tessmer was guilty of recklessness or callous neglect. Therefore, I cannot disagree with the district court's conclusion that Tessmer's conduct, at worst, cannot "reasonably be characterized ... as *deliberately* indifferent, wanton or obdurate." (Emphasis added.) As a result, I would **AFFIRM** in all respects.