NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0570n.06
Filed: July 7, 2005

No. 03-4196

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| STEPHEN JARRIETT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| JULIUS WILSON et al., | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

Before: MOORE and GIBBONS, Circuit Judges; and EDMUNDS, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Plaintiff-appellant Stephen Jarriett, an inmate

at the Trumbull Correctional Institution (TCI), was placed in a "strip cage" in the TCI segregation

unit for twelve hours. Jarriett brought a claim under 42 U.S.C. § 1983 against various prison guards

and officials in their individual and official capacities, alleging that the defendants violated his

Eighth Amendment rights by acting with deliberate indifference to his serious medical needs during

the period he was in the strip cage. Defendants Captain Haril Hurst, Lieutenant Dan Franklin,

Kenneth Nicholson, and Stanley Klatka filed a motion for summary judgment, which the district

court granted. Jarriett appeals, arguing that the district court erred in: (1) finding that Jarriett could

not establish the requisite physical injury under 42 U.S.C. § 1997e(e) to bring his § 1983 claim for

---

[*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of
Michigan, sitting by designation.

damages; and (2) holding that the defendants are entitled to qualified immunity. For the reasons set

forth below, we affirm the district court's decision.

**I.**

Jarriett, an inmate at TCI, was placed in the prison's segregation unit for fighting with

another inmate. While in segregation, Jarriett went on a hunger strike to protest various prison

conditions. Jarriett had a cellmate, Quentin Nicholson, who was required to eat his meals in a "strip

cage" in the segregation unit so he would not pass any food to Jarriett during the hunger strike. A

strip cage is a mesh steel cage with a small hole through which clothes or other items can be passed.[1]

On August 26, 2000, Quentin Nicholson was removed from his cell and placed in a strip cage

to eat dinner. After being informed by a desk officer that Nicholson was placing cornbread in his

jumpsuit, presumably in order to take it back to Jarriett, correctional officers Stanley Klatka and

Kenneth Nicholson ordered Quentin Nicholson to strip. The officers also confiscated the cornbread.

They then pulled Jarriett out of his cell, since they suspected Jarriett had stored food there. They

placed him in a strip cage next to Nicholson's and ordered him to strip. While Jarriett later claimed

---

[1] It is difficult to ascertain from the record precisely how big the cages are or how many of them there were. Jarriett claimed the one he was placed in was no bigger than two and a half feet square and that he could only sit down in a "cramping position" by "ball[ing] himself up." Jarriett also said that the other cage was right next to the smaller cage but larger, around five feet square, and that an inmate could lie down in that one. Defendant Kenneth Nicholson confirmed that the cages were of different sizes and that Jarriett was placed in a smaller cage. Jarriett's cellmate Quentin Nicholson, who was placed in a larger cage, testified that he thought the cages were the same size, adding that "[y]ou can reach from arm to arm and touch all the sides, you know, you can touch both side [sic]. It's not wide at all and it's not very big." Defendant Hurst asserted that the inmates could "sit down on the floor and . . . not be boxed up" in any of the cages. Also, while defendant Stanley Klatka claimed there were three cages in August 2000, Quentin Nicholson recalled only two.

that he fully complied with the order to strip, the officers testified that both Jarriett and Nicholson refused to comply promptly with their orders. As Jarriett stripped, a gang-related picture was discovered in his jump suit. Evidently, both men eventually took off all of their clothes, although the officers claimed they did not go through the whole "stripping out" procedure, which consists of running fingers through their hair and exposing all other parts of the body so officers can inspect the inmates for contraband. Officer Klatka said that during this time both Jarriett and Quentin Nicholson were cursing at him and the other officers, and he described Jarriett's attitude as "cocky, defiant, rude, crude, angry." Jarriett admitted to "horsing around" with Quentin Nicholson, but he claimed that he complied with all the steps of the stripping out procedure.

Officers Klatka and Nicholson reported the recalcitrance of the two inmates to their shift supervisor, who informed them that he would let the next shift's supervisor know of the situation. At about the time the next shift's officers came on the scene, a porter pushed a cart of laundry near the inmates' cages, so that both Jarriett and Nicholson could obtain clothing and blankets. Officers Daniel Franklin and Harold Hurst, the incoming shift supervisors, went to the unit to evaluate the situation later in the evening, at which point they found Jarriett and Nicholson to be clothed. According to these officers, the inmates again refused to fully comply with the stripping out procedure, even though Hurst and Franklin told them they could return to their cell upon completion of the procedure. Hurst and Franklin had been told that the inmates had never completed the procedure. Eventually, Nicholson complied with the procedure and went back to his cell. After about twelve hours, Jarriett was let out of the cage and sent to a cell in the segregation unit without a cellmate.

Jarriett testified in his deposition that during the entire time he was in the cage he made clear to all the officers that he had a bad leg and should not be standing.[2] Jarriett claimed that he repeatedly asked if he could see a doctor because of his leg pain, but Franklin testified that Jarriett did not ask for anything, complain about his legs, or ask to see any medical staff. Specifically, Jarriett said he told: "Captain Hurst, Lieutenant Franklin, Mr. Nicholson, Mr. Klatka, the desk officer. Anybody I could have that would listen at the point when my leg started swelling up." Jarriett indicated that he told Franklin, "I need to see a doctor. I'm in terrible pain . . . . My leg is as big as a grapefruit and my toes have no sensation." Jarriett described his right leg at the end of the time he was in the cage as swollen "like a grapefruit" from his knee down to his ankle: "My leg is just boom, boom, boom. Feels like it's trying to bust." In response to the question, "Did that cause you physical pain as well?," Jarriett answered, "Yes. I couldn't – I was forcing myself. I couldn't stand, but yet, I couldn't sit. . . . Because the cell was too small, and then when I would sit, I would get severe cramps in my thighs." He also testified that his "veins were like really ugly."

Klatka testified that Jarriett mentioned his bad leg but that Klatka did not see any swelling and that Jarriett was "jumping around, you know, messing around, running back and forth in the cage, you know, turning circles." Officer Nicholson also testified that the officers offered to put Jarriett in the larger cage but that Jarriett and Quentin Nicholson did not want to switch. Hurst

_____

[2]Before being incarcerated, Jarriett suffered a motorcycle accident, which resulted in injuries to his right leg and ankle. Because of the accident, there is a metal rod running from his right knee to his ankle. The accident was noted on Jarriett's medical screening sheet when he arrived at TCI, at which point he was restricted to the bottom bunk. Jarriett later received a sports participation restriction, although he was medically cleared for food service work at TCI.

described the inmates' physical state as "uncomfortable," but they did have blankets, which Hurst chose not to remove even though the blankets were prohibited. Jarriett, who evidently stood for almost all of the time he was in the cage, told Hurst that he had a "no standing waiver," and Hurst suggested that Jarriett sit down or strip out so that he could leave the cage.[3] Klatka and Kenneth Nicholson stated that they checked Jarriett's medical records, but they found nothing on file regarding a leg condition that would preclude him from remaining in the strip cage. Franklin was likewise unaware of any medical condition Jarriett might have had that would have been aggravated by prolonged standing.

The record indicates that after the incident, on August 27, 2000, Jarriett was seen by TCI medical staff. His only complaint to medical staff at that time concerned his hunger strike. Jarriett was again seen by medical staff on August 29, 2000, but there are no indications in his records that he complained about his right leg. On September 1, 2000, he was again examined, and Jarriett testified that during this examination he "definitely mentioned" the fact that his right leg was bothering him, even though it was "not swollen anymore."[4] The examining physician noted that his *left* toe was mildly swollen, but that the color and sensation to both feet were "adequate." Two weeks later, on September 15, Jarriett again saw medical staff, having complained about pain in his right ankle. The doctor noted Jarriett's "complaints of pain and loss of feeling in right leg and foot

---

[3]TCI Health Care Administrator Marilyn Lane stated in an affidavit that "[a]t no time did Jarriett have a 'no prolonged standing' restriction ordered by a physician at TCI."

[4]Jarriett seemed to indicate in his testimony that the September 1 visit was his first visit to the doctor after the incident occurred, stating: "As a matter of fact, what is it, three days later,...I'm just now seeing a doctor."

since 8-26, swelling, and 4 days later the swelling went away." His gait was described as slow and limpy. Jarriett's range of motion was limited in his right leg and toes, but Jarriett "said this is old injury." He had x-rays taken of his right foot, leg, and ankle, but no injuries or conditions other than those attributable to Jarriett's pre-incarceration accident were discovered.

Jarriett filed a pro se complaint in the United States District Court for the Northern District of Ohio on September 12, 2001, bringing claims against Klatka, Kenneth Nicholson, Hurst, Franklin, Warden Julius Wilson, and correctional officers Curtis Green and Adrian Green. He sued the defendants in their individual and official capacities under 42 U.S.C. § 1983, alleging that the defendants violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs during the period he was in the strip cage. Jarriett requested declaratory and injunctive relief as well as compensatory and punitive damages.[5] On January 29, 2002, the parties agreed to the exercise of jurisdiction by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).[6] Jarriett secured the services of counsel in October 2002. On February 18, 2003, the parties agreed to a stipulated notice of dismissal with prejudice of Jarriett's claims against Wilson, Curtis Green, and Adrian Green.

Defendants Hurst, Franklin, Nicholson, and Klatka moved for summary judgment on May 1, 2003. The district court granted the motion on August 12, 2003. Jarriett appealed to this court on September 9, 2003.

---

[5]At oral argument, Jarriett's counsel conceded that Jarriett's claims for injunctive relief were moot, since Jarriett was released from TCI after filing his complaint. We thus need not decide whether 42 U.S.C. § 1997e(e) applies to claims seeking injunctive relief.

[6]This opinion refers to the magistrate judge as the district court.

**II.**

A district court's grant of summary judgment is reviewed *de novo*. *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996). The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party." *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). If the moving party establishes an absence of evidence in support of the nonmoving party's case, the "nonmoving party has the burden of coming forward with evidence raising a triable issue of fact." *McKay v. Toyota Motor Mfg.*, 878 F. Supp. 1012, 1013 (E.D. Ky. 1995). If a reasonable jury could not return a verdict for the nonmoving party on the basis of the evidence as construed in its favor, summary judgment should be granted to the movant. *See Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

**A.**

The Prison Litigation Reform Act states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). This statute applies to Eighth Amendment claims for emotional or mental damages such as Jarriett's.[7]

---

[7]Jarriett's counsel at oral argument confirmed that Jarriett was bringing such a claim, even though he complained of physical pain suffered due to his time in the strip cage. We assume without

*Grissom v. Davis*, 55 Fed. Appx. 756, 758 (6th Cir. 2003); *Lucas v. Nichols*, No. 97-2060, 1999 U.S. App. LEXIS 8151, at *5 (6th Cir. Apr. 23, 1999); *see Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997). This court has indicated in unpublished opinions that even though the physical injury required by § 1997e(e) for a § 1983 claim need not be significant, it must be more than *de minimis* for an Eighth Amendment claim to go forward. *See, e.g., Adams v. Rockafellow*, 66 Fed. Appx. 584, 586 (6th Cir. 2003) (citing *Siglar*, 112 F.3d at 193, and *Luong v. Hatt*, 979 F. Supp. 481, 485 (N.D. Tex. 1997)); *Corsetti v. Tessmer*, 41 Fed. Appx. 753, 755 (6th Cir. 2002) (citing *Siglar* and *Luong* in finding that two small bruises and minor cuts were *de minimis* injury); *Styles v. McGinnis*, 28 Fed. Appx. 362, 364 (6th Cir. 2001) (citing *Siglar*); *Benson v. Carlton*, No. 99-6433, 2000 U.S. App. LEXIS 21202, at *3 (6th Cir. Aug. 9, 2000) (citing *Siglar* in finding that prisoner's "whirling sensation" in head after missing a meal was *de minimis* injury); *see also Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992) (holding that "cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force") (quotation and citation omitted); *cf. id*. at 10 (finding that "bruises, swelling, loosened teeth, and a cracked dental plate" suffered as the result of a beating by prison guards were not *de minimis* injuries).

The district court did not err in concluding that Jarriett did not present sufficient evidence to meet the § 1997e(e) standard. If Jarriett did suffer an injury when he was confined to the strip

---

deciding that such physical pain qualifies as "mental or emotional injury" under § 1997e(e). *See also Sealock v. Colorado*, 218 F.3d 1205, 1210 n.6 (10th Cir. 2000) ("Assuming without deciding that physical pain constitutes 'mental or emotional injury' within the meaning of [§ 1997e(e)], appellant satisfies the statutory requirement because he has made a prior showing of physical injury, i.e. his heart attack.").

cage for twelve hours on August 26 and 27, 2000, the evidence does not permit a finding that it was more than *de minimis*.

Jarriett testified in his deposition that during his August 26 and 27 confinement in the cage, his leg became very swollen, "like a grapefruit," that he suffered pain while standing, and that he had severe cramps in his thighs when he tried to sit. No other evidence supports Jarriett's claim of physical injury for § 1997e(e) purposes. Other uncontroverted evidence in the record is relevant in evaluating the seriousness of this injury. TCI medical staff saw Jarriett on August 27 and August 29, 2000, but he made no complaint about his right leg on either occasion.[8] Jarriett again saw medical staff on September 1. While Jarriett asserts that he mentioned pain in his right leg on that date, the medical record indicates mild swelling of his left toe and adequate color and sensation in both feet with no need for treatment. Jarriett concedes that his leg was not swollen on September 1. Only on September 15, some three weeks after the cage confinement, did Jarriett complain to medical staff that he had had swelling, pain, and loss of feeling in his right leg since August 26. The only medical findings on the September 15 visit relate to Jarriett's previous injuries from the motorcycle accident.

Cast in the light most favorable to Jarriett, the evidence shows merely that Jarriett had swelling, pain, and cramps, which were not serious enough to mention to medical staff the day of

---

[8]At one point in his deposition, Jarriett indicates that he mentions his leg every time he goes to the doctor. There is no suggestion in the deposition that this testimony relates to complaints about injury from his confinement in the strip cage; rather, the overall response reveals that Jarriett is referring to his pre-incarceration injury rather than an exacerbation of that injury by prolonged standing in the strip cage.

his release from the strip cage or two days later and which produced no medical findings at the point at which Jarriett claims to have mentioned them to staff on September 1 and 15. This constitutes nothing more than a *de minimis* injury for purposes of § 1997e(e). *See Siglar*, 112 F.3d at 193 (finding that prisoner who alleged that he had a bruised ear for three days did not meet § 1997e(e) standard); *Luong*, 979 F. Supp. at 485-86 (finding that minor abrasions on the forearm and chest, a contusion with slight swelling of the jaw, a swollen wrist, cuts on the face and tongue, and a bloody nose were only *de minimis* injuries because they were the types of injuries that would not require "a free world person to visit an emergency room, or have a doctor attend to, give an opinion, diagnosis and/or medical treatment for the injury"). Because Jarriett cannot show a physical injury pursuant to § 1997e(e), we affirm the district court's grant of summary judgment on his claims for damages.

**B.**

Even if, however, the evidence supported a finding of more than *de minimis* physical injury, defendants are entitled to qualified immunity, as the district court found. The question whether qualified immunity applies is a question of law reviewed *de novo*. *Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 346 (6th Cir. 2001).

Qualified immunity protects government officials from civil liability for actions taken within their official discretion insofar as these actions do not violate clearly established statutory or constitutional rights of which a reasonable official would have been aware. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is not merely a defense to liability; rather, when applicable, qualified immunity protects government officials from lawsuits and, hence, the burdens of litigation.

*See Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). To assert qualified immunity, an official must first demonstrate that she acted within her discretionary authority. *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). Once the official makes this showing, the burden shifts to the plaintiff to prove that the officer violated a right so clearly established that any reasonable official in her position would have understood it was unlawful to engage in the conduct that violated the right. *Id.* In the present case, Jarriett does not dispute that the defendants were acting within their authority as correctional facility officers, so the burden shifts to Jarriett to overcome the qualified immunity defense.

This court evaluates this burden according to a three-prong standard. *See Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999). First, the court considers whether a constitutional or statutory violation occurred. *Id.* If so, the court then considers whether the right that was violated was clearly established in the sense that a reasonable person would have known of the right. *Id.* The right must have been "clearly established at the time of the actions in question." *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996). If the right was clearly established, the court's third step is to "determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams*, 186 F.3d at 691. The operative question "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

Jarriett alleges that the defendants violated his Eighth Amendment rights. To establish his § 1983 claim for a violation of Eighth Amendment right, Jarriett must meet the standard delineated by the Supreme Court in *Estelle v. Gamble*:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

429 U.S. 97, 104-05 (1976) (citation and footnotes omitted). The deliberate indifference standard has been interpreted to require an inmate plaintiff to show that prison official defendants acted with a reckless disregard of a known risk of serious harm to the prisoner. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The standard includes both objective and subjective components. First, the deprivation of Eighth Amendment rights must be "sufficiently serious" such that the prison officials' acts or omissions objectively result in the denial of "the minimal civilized measure of life's necessities." *Id*. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991), and *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Second, the prison officials must have acted with a "sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298. In other words, a prison official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997) (quoting *Farmer*, 511 U.S. at 837).

Jarriett cannot meet either the objective or subjective components of the deliberate indifference standard, and thus he cannot show a constitutional violation. With regard to the objective component, an inmate who argues that a delay in medical treatment amounted to an Eighth Amendment violation "must place verifying medical evidence in the record to establish the detrimental effect of the delay." *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994)). As discussed *supra*, Jarriett can point to no medical records to support his argument that he suffered a "sufficiently serious" injury for Eighth Amendment purposes when the officers refused to give him medical treatment during his time in the strip cage. The medical evidence in the record indicates that after being released from the cage, Jarriett did not mention the pain in his leg to a doctor until September 1. Also, while he claims that he complained to defendants about his leg during his time in the cage, Jarriett certainly did not exhibit any medical needs "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990). Crucially, there is no evidence to indicate that Jarriett *showed* any swelling of his leg to the officers. If the evidence indicated that the officers saw the swelling in Jarriett's leg, then Jarriett would have a stronger case that summary judgment was inappropriate. However, even when one credits Jarriett's depiction of events, no reasonable corrections officer could have concluded that Jarriett was being denied "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834 (quoting *Rhodes*, 452 U.S. at 347).

With regard to the subjective component, Jarriett argues that his "limpy" gait and leg condition would have been known to the defendants, who had interacted with Jarriett before the

incident on August 26, 2000. Jarriett asserts that these facts, together with his telling the officers that he had a "no standing waiver" on file and that he was in pain, indicate that the defendants disregarded a known, substantial risk of injury to Jarriett by leaving him in the strip cage. Jarriett's argument is without merit. The officers took reasonable action to check on Jarriett's records when he mentioned his leg injury, and they found no indication in his file that he could not stand for a sustained period of time in a strip cage. Even if they were aware of Jarriett's previous injury from a review of his files or from prior interaction with him, they had no reason to believe that he could not be placed in the strip cage for a twelve-hour period. In addition, Jarriett could in fact sit in the cage for short periods, albeit in a cramped position. Furthermore, it should be noted that not only did the officers make clear to Jarriett that he could return to his cell if he completed the stripping out procedure, but they also offered to put Jarriett in a larger cage. He refused their offer.

Put simply, Jarriett cannot show deliberate indifference on the part of the defendants. He therefore cannot meet his burden of showing that a constitutional violation occurred. Defendants are entitled to qualified immunity,[9] and the district court's grant of summary judgment was appropriate.

## III.

For the foregoing reasons, we affirm the district court's decision.

---

[9]As the district court pointed out, since there was no constitutional violation, Jarriett's official-capacity claims also fail. *See Scott v. Clay County*, 205 F.3d 867, 879 (6th Cir. 2000) (concluding that if none of the officer-defendants deprived the plaintiff of any constitutional right, the official-capacity claim against the public entity represented by those officer-defendants also must fail).

*No. 03-4196*
*Jarriett v. Wilson*

**KAREN NELSON MOORE, Circuit Judge, dissenting.** I respectfully dissent. Although I agree with the majority's statement that the court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party," Maj. Op. at 7 (quoting *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001)), I do not believe that the majority has done so in this case. Instead, the majority repeatedly credits witnesses for the officers despite contrary assertions made by Jarriett and Quentin Nicholson under oath. Taking the facts in the light most favorable to Jarriett, we must conclude that he was forced to stand in a two-and-a-half-foot by two-and-a-half-foot cage for approximately thirteen hours (naked for the first eight to ten hours, and unable to sit for more than thirty or forty minutes of the total time), in acute pain, with clear, visible swelling in a portion of his leg that had previously been injured in a motorcycle accident.[10] During this time, Jarriett repeatedly requested to see a doctor in regard to his injured leg, but his requests were ignored. He was not even examined by a nurse until at least three days after the incident, and was never actually given the opportunity to be put in a larger cage. These events resulted in more than *de minimis* physical injury, *see Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992), including excruciating physical pain and severe swelling of his leg that would be obvious even to a lay person. As it was clearly established at the time that the Eighth Amendment (as applied to the states through the Fourteenth Amendment Due Process Clause) prohibits "unnecessary and wanton infliction of pain," *Whitley v. Albers*, 475 U.S. 312, 327 (1986), and requires that inmates be

[10]Jarriett was approximately 40 years old at the time, stood five-feet-ten-and-a-half inches tall, and weighed 230 pounds.

- 15 -

provided with adequate medical care, *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976), the officers

should not be entitled to qualified immunity.  Accordingly, I respectfully dissent.